

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-08-300-CR

DEMARKCUS L. CLARK                                                    APPELLANT

V.

THE STATE OF TEXAS                                                          STATE

------------

FROM CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY

------------

## OPINION

------------

### I. Introduction

A grand jury indicted Appellant Demarkcus L. Clark on February 2, 2007. The indictment alleged that on or about July 25, 2004, Appellant intentionally caused the death of Keiss Allison by shooting him with a firearm during the course of committing or attempting to commit robbery.[1] Appellant pleaded not guilty at his trial in August 2008. The jury found Appellant guilty of capital murder, and the trial court sentenced him to life in prison. Appellant contends in two points that the evidence is factually

---

[1] *See* Tex. Penal Code Ann. § 19.03(a)(2) (Vernon Supp. 2009).

insufficient to sustain his conviction and that he received ineffective assistance of counsel. We affirm.

## II. Factual Background

At approximately 1 a.m. on July 25, 2004, Fort Worth police officers responded to a reported shooting at an apartment complex. Officer James Chilson was the first to arrive, and he testified that he saw the victim, Keiss Allison, lying in the roadway approximately 100 feet from his apartment, with six or more people standing nearby.

Christopher Carter testified that he lived with Allison at the time of the shooting, that he met Allison while "running around looking for some dope," that Allison was a drug dealer, and that Allison supplied drugs to him in exchange for the use of his car. Carter admitted he had abused drugs, specifically crack cocaine, the day of the shooting, but he testified he had been "clean" for about a year as of the time of trial. Carter also testified, however, that he was on parole from a fifty-year sentence for unauthorized use of a motor vehicle.

Carter testified that a "kind of a chubby fellow" driving a brown or tan Buick LeSabre or similar car had stopped at the apartment earlier on the night of the shooting and asked for Allison. Carter told the man Allison was not there.

Carter last saw Allison in the apartment at approximately 9 p.m. the night of the shooting when Carter left to go to the store with Tonya Fluker and other people

2

he did not know.[2]  When he and the others returned from the store, Carter saw a man he described as "a slim fella" in the apartment parking lot carrying a pistol-grip shotgun.  Carter testified that he did not see the man well enough to identify him for the police but that the car he had seen earlier that night was "possibly" at the apartment at the time.  The man with the shotgun told the driver of the car that it would be best if they left.  Carter "bailed out of the truck, ran into the front of the apartments[,] and . . . hid behind some trash cans."  He heard about three gunshots while hiding.  After he felt it was safe to do so, Carter emerged from his hiding place and sat on the curb in front of the apartments.  He admitted, however, that he subsequently "kind of ran and ducked and dodged" the police for approximately two years because he did not want to be involved.

Anthony Foreman testified that Allison was a friend and one of his drug dealers.  Foreman walked to Allison's apartment about midnight the night of the shooting to "do drugs," and when he arrived, Allison and Christopher Henderson were standing in the apartment doorway "rapping about [him] walking over there."  Foreman testified that he, Allison, and Henderson had been standing by the gate near Allison's apartment when a gold Cutlass pulled into the parking lot.  A heavy-set, African-American man got out of the passenger-seat and walked up to the fence.  On Allison's invitation, Allison and the man went inside the apartment together.  A slimmer African-American man then got out of the rear passenger-seat

---

[2] Carter described Fluker as a "crackhead" that he and Allison knew from "the life of dealing drugs."

3

of the car, and Henderson told the man to wait outside. The slimmer man "got mad and told [Henderson] that was his money and he was goin[g] in there about the business, too." Foreman testified that he was able to calm the man down for a moment and that Allison opened the apartment door and invited the slimmer man inside. Henderson also went inside after a few moments.

While Foreman waited outside, the slimmer man came out of the apartment and walked to his car. At about the same time, the vehicle with Carter, Fluker, and a man named "Fish" inside drove into the parking lot. The slimmer man talked to the people in Fish's car and then tapped on the trunk of the gold Cutlass "to alert the guy on the inside to pop the trunk." The driver of the car, who Foreman testified he saw in the car but did not see his face, "popped his trunk button and [the slimmer man] open[ed] the trunk and pulled out a 12-gauge." Foreman testified that the slimmer man walked up to him, pointed the shotgun at him, and told him to go inside the apartment. Foreman refused and ran toward a church behind the apartments. As he ran past a window to Allison's apartment, Foreman heard Allison tell the men that he was not going to give them anything else and that he had given them everything he had. From the church, Foreman looked back, saw three people running away from Allison's apartment toward the parking lot, and heard five gunshots.

Foreman ran back to Allison's apartment and went inside to see if anyone had been shot. Not seeing anyone in the apartment, he went to a neighbor's apartment to ask her to call the police, but Foreman heard Fluker saying, "Here he is right

4

here." Foreman then saw Allison lying in the middle of the street. Foreman testified that the police interviewed him that night and that he went to the police station with the officers "to let them know that [he] saw everything that happened." On cross-examination, Foreman testified that he had previous convictions for possession and theft and that he was not able to identify anyone when a homicide detective showed him a photo spread.

Detective Matthew Hardy testified that he was the homicide detective assigned to the case and that he arrived at the scene approximately an hour and a half after the shooting. Detective Hardy testified that he interviewed Foreman, Henderson, and Fluker that night.[3] However, the investigation continued for more than two years.

Detective Hardy interviewed Duron Gibson at the Tarrant County jail in October 2005, and Gibson directed him to Appellant a/k/a "Dough Boy." In January 2006, Detective Hardy spoke with Fort Worth narcotics officer Broadwater and a confidential informant and was able to identify Issack Fountain as a possible participant. Detective Hardy located Fountain and interviewed him at the Department of Corrections in DeQuincy, Louisiana. In the interview, Fountain minimized his own involvement and said that Appellant was the shooter.

Detective Hardy interviewed Appellant on August 21, 2006. In the interview, Appellant denied that he knew Allison or what had happened to him. Appellant also

---

[3] Fluker and Henderson did not testify at Appellant's trial. Detective Hardy said he unsuccessfully tried locating them before trial.

told Detective Hardy that Prinsell Williams had used his name in the past. In fact, Appellant was arrested during a federal drug investigation but later released after investigators determined that Williams had used Appellant's name.

On August 22, 2006, Detective Hardy interviewed Carter and showed him a photo spread that included pictures of Fountain and five other African-American males. Carter identified Fountain and said, "[T]his kind of looks like the person who came up to the car that he was in, who had the shotgun," but Carter was not completely positive of his identification. Detective Hardy prepared a different photo spread that included Appellant's photograph, but Carter was not able to identify anyone in that photo spread.

Detective Hardy testified that between Fountain, Appellant, and Avion Anderson, a man Appellant had implicated in Allison's death, Appellant is physically the largest and Fountain is the thinnest. Detective Hardy also said that the physical descriptions in his file indicated that Fountain is five foot, ten inches and 160 pounds, that Anderson is five foot, nine inches and 190 pounds, and that Appellant is five foot, eleven inches and either 225 or 275 pounds.[4] Detective Hardy said that the physical descriptions in his file are generally consistent with Fountain's, Anderson's, and Appellant's actual heights and weights.

---

[4] The October 2004 physical description in Detective Hardy's file listed Appellant at 225 pounds, and the January 2006 description listed Appellant at 275 pounds.

Detective Hardy also interviewed Fluker and said she tentatively identified Appellant in a photo spread. On the photo spread, Fluker wrote, "I believe to my knowledge this man [Appellant] came to SUV I was in."[5] Detective Hardy testified that Fluker's identification differed from the others; Fluker said the heavy-set man retrieved the shotgun from the car and other witnesses said it was the skinnier man. Detective Hardy also testified that Fluker did not identify Appellant as the man that came to the car until she saw the photo spread.

Appellant was arrested on February 5, 2007. Detective Hardy interviewed him later that day and obtained two written statements. In the first statement, Appellant admitted being at Allison's apartment with Fountain and Anderson to obtain cocaine to sell but denied knowing Allison before that night. Appellant said that Henderson pulled a pistol-grip shotgun while Fountain and Allison were "tussling, wrestling," that Fountain pulled a revolver and forced Henderson to the ground, that Allison pushed Fountain off of Henderson and ran out the door, and that Fountain shot Allison. Appellant also said that Fountain threatened to kill him and Anderson if they told anyone what had happened and that Fountain had stolen some cocaine from the apartment. Appellant wrote that he first learned that Allison had been killed about three days after the shooting.

---

[5] Appellant did not object to Detective Hardy's testimony about Fluker's statements to him, the admission of the photo spread, or the inclusion of Fluker's written comment on the photo spread.

In the second statement, Appellant admitted that he did know Allison before the night of the shooting, that he had met Allison at a dope house where a man named "Hot Sauce" lived, and that he had told Fountain they could get some dope to sell from Allison. Appellant stated that he and Fountain went to Allison's apartment earlier the night of the shooting, that Allison was not there at the time, and that he and Fountain later returned to Allison's apartment. Appellant wrote that after he and Fountain went inside Allison's apartment, Fountain told Allison to "give me what you got," pointed a revolver at Allison, and made Allison empty his pockets. Appellant said that Fountain took the forty dollars Allison had in his pocket, that Henderson pulled out a shotgun, and that Fountain pointed the revolver at Henderson and made him get on the ground. Appellant stated that Anderson then came through the door with the pistol-grip shotgun, that Henderson and Allison ran out the door, and that Fountain fired five or six shots at Allison.[6]

Detective Hardy testified that Appellant did not admit in either of his statements to receiving any of the proceeds of the robbery, to disposing of the cartridges from the revolver, or to having the intent before going to Allison's apartment to commit an offense other than purchasing drugs. Detective Hardy agreed that Appellant admitted to being at the scene but did not admit to being a

[6] Detective Hardy testified that he did not have enough corroborating information from his investigation to charge Anderson with Allison's murder. And although the State called Anderson as a witness at trial, Anderson advised the trial court outside the presence of the jury that he would refuse to testify because of three pending felony cases.

party to the murder. Detective Hardy also testified that Appellant had given him information about a murder Fountain had committed in 1997 or 1998, that he filed a case against Fountain for that murder, and that the information Appellant provided about that murder was accurate.

On cross-examination, Detective Hardy agreed that the majority of people he interviewed in this case were involved with drugs in one way or another. He testified that the family initially directed him to a person named Jonathan Williams and that he was aware of two different people known as "Dough Boy" in the Fort Worth area. Detective Hardy also said that he prepared approximately ten photo spreads in the case and that several people were not able to make any identifications.

Fountain testified that he is in custody for two murders and a federal drug case.[7] He said that he is serving a thirty-five year sentence for the federal drug case, that he pleaded guilty to two murders and received two sentences of twenty-two years and six months to run concurrently, and that a condition of his State plea bargain required him to testify truthfully in Appellant's case. Fountain also said that he had been on parole for a different felony drug case in Louisiana and that he had other felony convictions in Tarrant County for attempted murder, evading arrest, and detention of a vehicle.

---

[7] Fountain testified that he pleaded guilty to murder in Allison's death and that he pleaded guilty to a 1997 or 1998 murder. As a matter of law, Fountain's trial testimony was that of an accomplice-witness. *See Brown v. State*, 270 S.W.3d 564, 567 (Tex. Crim. App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009).

Fountain further testified that Appellant and Anderson are his cousins and that Appellant is known as "Dough Boy." Fountain said that he, Appellant, and Anderson had smoked "weed" the night of the shooting and were at another cousin's apartment when Appellant started talking about "hitting a lick," which he understood to mean to commit a robbery. Fountain testified that Appellant said that he wanted to "go hit a lick" on Allison and that Appellant called Allison to set up the robbery by telling Allison that he needed to buy some drugs. Fountain said he understood from Appellant that Allison had a lot of drugs and money. Fountain testified that he did not know Allison before the night of the shooting.

Fountain said that he, Appellant, and Anderson went to Anderson's sister's house to get three guns: a shotgun, a revolver, and a .45. Fountain said he had the shotgun and Appellant had the revolver. Anderson drove to Allison's apartment, Appellant rode in the passenger seat, and Fountain rode in the back. Fountain testified that when they arrived at the apartment, he saw Fish in the parking lot and told Fish to leave. Fountain said that he and Appellant got out of the car, that Anderson stayed in the car, and that he and Appellant went into the apartment with Allison and another man he did not know. The man Fountain did not know initially said they both could not go inside, but Allison invited them both into the apartment.

Fountain testified that Allison was "weighing up the dope" inside the apartment and that Appellant pulled out a revolver and made Allison and the other man get on the floor. Fountain then went to the car and retrieved a shotgun. Fountain said that

10

on his way back into the apartment, another man on the side of the building ran through the gate. Fountain went back into the apartment, and Anderson followed him inside. They were looking through the apartment for things to take in the robbery when "all of a sudden [Allison] got up and ran." Fountain testified that Appellant shot Allison four or five times as Allison ran.

Fountain testified that after the shooting, he, Appellant, and Anderson went to Fountain's sister's house and split up what they had stolen: "$1,500, about ten grams of cocaine, crack[,] and a scale." Fountain said he emptied the revolver after the shooting and threw the rounds in the trash, even though it was Appellant's gun, because "when you do stuff like that with people, you've got to help clear yourself, too, man. And that's just part of what I did." Fountain said that there was an agreement among them to rob Allison but that there was no agreement for murder. Fountain admitted on cross-examination that this was not the first "dope house" that he had "jacked."

Fountain testified that he recalled telling Detective Hardy that this type of violence was not normal for Appellant. Fountain also said he was aware that a man named Bertram Bell had claimed to have heard him brag to his girlfriend that he had committed the murder. Fountain said his girlfriend testified in his federal case that she did not know anything about Allison getting killed.

Kevin Spencer testified that he had known Appellant, Fountain, Anderson, and Allison for several years before the shooting. He said that he was currently serving

11

a fifteen-year sentence in a federal penitentiary for conspiracy to distribute and manufacture cocaine arising out of a federal drug investigation. Spencer testified that the prosecutors had agreed to notify federal authorities of his assistance if he testified truthfully in Appellant's trial so that he could apply for "Rule 35 credit," one of only a few procedures he believed might potentially reduce his federal sentence.

Spencer testified that he talked with Appellant three different times after the shooting and that Appellant told him, "I put my work in."  Spencer explained, "[i]n street terms[,] when they say they 'put their work in,' you know, nine times out of ten you're going to shoot someone with the intention to kill them."  Spencer testified that Appellant told him he shot Allison because Allison went for a gun, but he also said Appellant bragged about having "put that work in" and seemed proud of having done so.  Spencer said Appellant told him people in the neighborhood "think I won't put the work in.  I'm going to put the work in."  Spencer testified that he believed Appellant wanted people to think he was a gangster and that killing Allison was a way for Appellant to "make his point."[8]

Bertram Bell testified for Appellant.  He said that he was brought to trial from Florida where he is serving a twenty-year sentence for conspiracy to distribute

---

[8] To impeach Spencer's credibility, defense counsel asked Spencer if he had anything to do with the murder of Appellant's brother, Montrell Clark.  Spencer denied involvement, and Detective Michael Carroll testified that he investigated Montrell's murder, that Eddie Taylor was charged and pleaded guilty to murdering Montrell, and that Spencer was never a suspect in Montrell's murder.

arising out of a federal drug investigation. Bell testified that he told Detective Hardy that he overheard a conversation between Fountain and his girlfriend in which Fountain said that he and Appellant went to Allison's apartment but that Appellant stayed in the car and did not know what was happening. Bell admitted, however, that he did not hear the entire conversation.

Bell testified that he was aware of Fountain always having a shotgun and that Fountain had even pulled a shotgun on him when Fountain had tried to rob him in the past. Bell told Detective Hardy during an interview that Fountain had a shotgun and a .380. Bell testified that he likes Appellant and that he does not like Fountain.[9]

Dr. Gary Sisler testified that he performed an autopsy on Allison's body on July 25, 2004. Dr. Sisler testified that Allison had an entry wound to his right lateral forearm, an exit wound on the inside of his forearm, a re-entry wound to his right chest, an entry wound to his back, and an entry wound near his abdomen. Dr. Sisler also said that he recovered three bullets from Allison's body. Dr. Sisler testified that the wound to Allison's chest was fatal, that the cause of death was multiple gunshot wounds, and that he classified Allison's death as a homicide. Robert Adkins, a retired firearms examiner, testified that he examined the three bullets removed from

---

[9] Assistant United States Attorney Mike Worley testified as a rebuttal witness for the State. He said that he prosecuted many of the defendants in the federal drug investigation, that Bell pleaded guilty in that case and provided information about several defendants, and that Bell recanted his testimony as to all but one of the defendants. Worley testified that the government could have asked the court to rescind Bell's plea agreement because he violated his plea agreement by recanting his testimony.

Allison's body and determined that all three bullets were fired from the same gun, a Smith and Wesson revolver.

### III. Applicable Law

Section 19.03(a) of the penal code provides in pertinent part, "[a] person commits [capital murder] if the person commits murder as defined under Section 19.02(b)(1) and . . . the person intentionally commits the murder in the course of committing or attempting to commit . . . robbery." Tex. Penal Code Ann. § 19.03(a). Section 19.02(b)(1) of the penal code provides that a person commits murder if he "intentionally or knowingly causes the death of an individual." *Id*. § 19.02(b)(1) (Vernon 2003). Section 29.02 of the penal code provides in relevant part that a person commits robbery "if, in the course of committing theft . . . and with intent to obtain or maintain control of the property, he . . . intentionally, knowingly, or recklessly causes bodily injury to another." *Id*. § 29.02(a)(1) (Vernon 2005).

### IV. Sufficiency of the Evidence

In his first point, Appellant contends the evidence is factually insufficient to sustain his capital murder conviction.[10] He argues that only unobjected-to hearsay and testimony from a convicted felon corroborated the accomplice's testimony. Because it is unclear whether Appellant challenges the sufficiency of the evidence corroborating his accomplice's testimony, the factual sufficiency of the evidence, or

---

[10] Appellant does not challenge the legal sufficiency of the evidence and acknowledges that the evidence is legally sufficient to sustain his conviction because of Carter's testimony and Fluker's hearsay identification of Appellant as a person at the scene with a weapon.

14

both, we review the evidence for corroboration of the accomplice's testimony and for factual sufficiency.

## A. Accomplice Witness Testimony

The accomplice-witness rule is a statutorily imposed sufficiency review and is not derived from federal or state constitutional principles that define the legal and factual sufficiency standards. *Cathey v. State*, 992 S.W.2d 460, 462–63 (Tex. Crim. App. 1999), *cert. denied*, 528 U.S. 1082 (2000). An accomplice is a person who participates before, during, or after the commission of the crime and can be prosecuted for the same offense as the defendant or for a lesser-included offense. *Medina v. State*, 7 S.W.3d 633, 641 (Tex. Crim. App. 1998). Fountain is an accomplice as a matter of law because he was also charged with and pleaded guilty to Allison's murder. *See Brown*, 270 S.W.3d at 567 (stating witness in capital murder case was accomplice as a matter of law because he "participated in the crime and . . . was subsequently convicted of aggravated robbery in accordance with a plea agreement for his participation"). Article 38.14 of the code of criminal procedure provides that "[a] conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense." Tex. Code Crim. Proc. Ann. art. 38.14.

When evaluating the sufficiency of corroboration evidence under the accomplice-witness rule, we "eliminate the accomplice testimony from consideration

15

and then examine the remaining portions of the record to see if there is any evidence that tends to connect the accused with the commission of the crime." *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008) (quoting *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001)). The corroborating evidence need not prove the defendant's guilt beyond a reasonable doubt by itself. *Id.*; *Trevino v. State*, 991 S.W.2d 849, 851 (Tex. Crim. App. 1999). Nor is it necessary for the corroborating evidence to directly link the accused to the commission of the offense. *Cathey*, 992 S.W.2d at 462. Rather, the evidence must simply link the accused in some way to the commission of the crime and show that "rational jurors could conclude that this evidence sufficiently tended to connect [the accused] to the offense." *Simmons v. State*, 282 S.W.3d 504, 508 (Tex. Crim. App. 2009). Additionally, "[p]roof that the accused was at or near the scene of the crime at or about the time of its commission, when coupled with other suspicious circumstances, may tend to connect the accused to the crime so as to furnish sufficient corroboration to support a conviction." *Malone*, 253 S.W.3d at 257 (quoting *Brown v. State*, 672 S.W.2d 487, 489 (Tex. Crim. App. 1984)). But "mere presence alone of a defendant at the scene of a crime is insufficient to corroborate accomplice testimony." *Id*. (quoting *Golden v. State*, 851 S.W.2d 291, 294 (Tex. Crim. App. 1993)).

Here, the evidence offered to corroborate Fountain's testimony begins with Appellant's written statements to Detective Hardy. In the written statements,

16

Appellant admitted that he was inside Allison's apartment with Fountain at the time of the shooting. In addition, Spencer testified that Appellant told him on three occasions that he "put his work in," that "putting your work in" meant shooting someone with the intent to kill, and that Appellant bragged about killing Allison. This evidence tends to connect Appellant to the commission of the offense alleged in the indictment. *See Brown*, 270 S.W.3d at 568 (stating that "under most circumstances, an admission or confession will be sufficient to corroborate the accomplice-witness testimony" and holding that accomplice testimony sufficiently corroborated by admitted perjurer who testified Brown acted unusually the day of the offense and admitted to being at the scene). The fact that Spencer's testimony may have been subject to impeachment as coming from an admitted felon goes to the weight of the evidence, not to its admissibility, and was within the province of the jury as the exclusive judge of the credibility and the weight to be given Spencer's testimony. *See id.* Consequently, we hold that Fountain's testimony was sufficiently corroborated and was properly considered by the jury under the requirements of article 38.14. *See* Tex. Code Crim. Proc. Ann. art. 38.14. We overrule this portion of Appellant's first point.

**B. Factual Sufficiency**

### 1. Standard of Review

When reviewing the factual sufficiency of the evidence to support a conviction, we view all the evidence in a neutral light, favoring neither party. *Steadman v. State*,

280 S.W.3d 242, 246 (Tex. Crim. App. 2009); *Watson v. State*, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006). We then ask whether the evidence supporting the conviction, although legally sufficient, is nevertheless so weak that the factfinder's determination is clearly wrong and manifestly unjust or whether conflicting evidence so greatly outweighs the evidence supporting the conviction that the factfinder's determination is manifestly unjust. *Steadman*, 280 S.W.3d at 246; *Watson*, 204 S.W.3d at 414–15, 417. To reverse under the second ground, we must determine, with some objective basis in the record, that the great weight and preponderance of all the evidence, although legally sufficient, contradicts the verdict. *Watson*, 204 S.W.3d at 417.

Unless we conclude that it is necessary to correct manifest injustice, we must give due deference to the factfinder's determinations, "particularly those determinations concerning the weight and credibility of the evidence." *Johnson v. State*, 23 S.W.3d 1, 9 (Tex. Crim. App. 2000); *see Steadman*, 280 S.W.3d at 246. Evidence is always factually sufficient when it preponderates in favor of the conviction. *Steadman*, 280 S.W.3d at 247; *see Watson*, 204 S.W.3d at 417. Unless the record clearly reveals that a different result is appropriate, we must defer to the jury's determination of the weight to be given contradictory testimonial evidence because resolution of the conflict "often turns on an evaluation of credibility and demeanor, and those jurors were in attendance when the testimony was delivered."

18

*Johnson*, 23 S.W.3d at 8.  Our deference in this regard safeguards the defendant's right to a trial by jury.  *Lancon v. State*, 253 S.W.3d 699, 704 (Tex. Crim. App. 2008).

### 2.  The Evidence is Factually Sufficient

Having determined that Fountain's accomplice-witness testimony was sufficiently corroborated, we now analyze all the evidence—including Fountain's testimony—in a neutral light to determine if factually sufficient evidence exists to support Appellant's conviction.  *See Steadman*, 280 S.W.3d at 246.

Reviewing all the evidence in a neutral light, we recall that many of the people Detective Hardy interviewed in this case were involved with drugs in one way or another, that Detective Hardy prepared approximately ten photo spreads in the case, that several people were not able to make any identifications, that Allison's family initially directed Detective Hardy to Jonathan Williams, that Detective Hardy knew of at least two people in the area known as "Dough Boy," and that Appellant was mistakenly arrested in a federal drug case because someone else had used Appellant's name.  We also recall that Fluker tentatively identified Appellant in a photo spread as the person that approached her car in the apartment parking lot and that Fluker's identification differed from the others because she said the heavy-set man, not the skinnier man, retrieved the shotgun from the car.  Further, Carter, on parole from a fifty-year sentence,  identified Fountain from a photo spread as the man outside the apartment with the shotgun, but Carter testified that he had used crack the day of the shooting and that he did not see the man well enough to identify

19

him for the police. In addition, Appellant admitted to being at the scene of the shooting, but did not admit to being a party to the murder, to receiving any of the proceeds of the robbery, to disposing of the cartridges from the revolver, or to having the intent before going to Allison's apartment to commit an offense other than purchasing drugs. There was also testimony from Bell that impeached Fountain's credibility and that Fountain had admitted to shooting Allison. And Fountain admitted that he emptied the revolver after the shooting, that this was not the first "dope house" that he had "jacked," and that this type of violence was not normal for Appellant. Finally, Spencer testified that Appellant bragged to him about shooting Allison, but Spencer testified in exchange for the State's agreement to notify federal authorities of his cooperation.

However, the jury also heard evidence that Appellant admitted being at Allison's apartment with Fountain and Anderson to obtain cocaine to sell and that Appellant told Spencer that he "put his work in," meaning he shot Allison with the intent to kill. Spencer said that Appellant bragged about having "put that work in," that Appellant seemed proud of having done so, that Appellant wanted people to think he was a gangster, and that killing Allison was a way for Appellant to "make his point." Furthermore, Fountain testified that Appellant initiated the talk about robbing Allison and that Appellant called Allison and told him he needed to buy some drugs in order to set up the robbery. Fountain said he had the shotgun and Appellant had the revolver. Fountain testified that he and Appellant went into the apartment with

20

Allison, that Appellant pulled out a revolver and made Allison and the other man get on the floor, that Fountain then went to the car for the shotgun and returned to the apartment, and that Appellant shot Allison four or five times after Allison got up and ran. Fountain also testified that they had stolen "$1,500, about ten grams of cocaine, crack[,] and a scale." Finally, the firearms examiner testified that the three bullets removed from Allison's body were fired from a Smith and Wesson revolver.

Moreover, we note that several witnesses corroborated extraneous parts of Fountain's testimony. For example, Carter testified that "a slim fella" with a shotgun told him and others in his car to leave, and Detective Hardy said Carter tentatively identified the man with the shotgun as Fountain from a photo spread. Further, Foreman testified that Henderson initially told the skinnier man he could not go inside the apartment with Allison, that the skinnier man entered but later walked out of Allison's apartment, talked to the people in Fish's car, and retrieved a shotgun from the car. The jury could have considered this testimony in weighing Fountain's credibility.

Finally, the fact that several witnesses are convicted felons does not necessarily render the evidence factually insufficient. The witnesses were impeached with evidence of their convictions, and the jury is the exclusive judge of the credibility of the witnesses and of the weight to be given to their testimony. *See Johnson*, 23 S.W.3d at 8 (describing difficulty in assessing credibility from "a cold

appellate record" and stating credibility assessment "usually requires deference to the jury's conclusion").

Viewing the evidence in a neutral light, we conclude a rational trier of fact could have found beyond a reasonable doubt that Appellant intentionally or knowingly caused the death of Allison in the course of committing or attempting to commit robbery. *See* Tex. Penal Code Ann. §§ 19.02(b)(1), 19.03(a)(2). Therefore, we cannot say that the evidence is so weak that the jury's determination is clearly wrong or manifestly unjust or that the conflicting evidence so greatly outweighs the evidence supporting the convictions that the jury's determination is manifestly unjust. *See Lancon*, 253 S.W.3d at 704; *Watson*, 204 S.W.3d at 414–15, 417. Accordingly, we hold that the evidence is factually sufficient to support the jury's verdict, and we overrule the remainder of Appellant's first point.

## V. Effectiveness of Counsel

In his second point, Appellant contends that he received ineffective assistance of counsel because his trial attorney did not object to Detective Hardy's hearsay testimony that Fluker identified Appellant as the person who approached her vehicle with a weapon the night of the incident. The State responds that we should overrule Appellant's second point because Appellant did not file a motion for new trial to develop the record and the record is silent concerning Appellant's counsel's reasoning and strategy.

## A. Standard of Review

To establish ineffective assistance of counsel, Appellant must show by a preponderance of the evidence that his counsel's representation fell below the standard of prevailing professional norms and that there is a reasonable probability that, but for counsel's deficiency, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); *Salinas v. State*, 163 S.W.3d 734, 740 (Tex. Crim. App. 2005); *Mallett v. State*, 65 S.W.3d 59, 62–63 (Tex. Crim. App. 2001); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). There is no requirement that we approach the two-pronged inquiry of *Strickland* in any particular order, or even address both components of the inquiry if the appellant makes an insufficient showing on one component. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069.

A reviewing court will rarely be in a position on direct appeal to fairly evaluate the merits of an ineffective assistance claim. *Thompson*, 9 S.W.3d at 813–14. "In the majority of cases, the record on direct appeal is undeveloped and cannot adequately reflect the motives behind trial counsel's actions." *Salinas*, 163 S.W.3d at 740 (quoting *Mallett*, 65 S.W.3d at 63). To overcome the presumption of reasonable professional assistance, "any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness." *Id.* (quoting *Thompson*, 9 S.W.3d at 813). It is not appropriate for an appellate court to simply infer ineffective assistance based upon unclear portions of the record. *Mata v. State*, 226 S.W.3d 425, 432 (Tex. Crim. App. 2007).

23

**B. Analysis**

Detective Hardy testified that Fluker tentatively identified Appellant in a photo spread. In addition, on State's Exhibit 24, the photo spread from which Fluker identified Appellant, Fluker had written, "I believe to my knowledge this man [Appellant] come to SUV I was in." Appellant did not object to Detective Hardy's testimony about Fluker's statements to him, the admission of the photo spread, or the inclusion of Fluker's written comment on the photo spread. According to Appellant, this unobjected-to hearsay, in combination with the testimony of a convicted felon, placed Appellant at the scene and in possession of a pistol-grip shotgun. We note, however, that the jury also heard testimony by Detective Hardy that Appellant admitted to being inside the apartment with Fountain and Anderson when Allison was killed and testimony by Fountain that Appellant shot Allison.

Appellant did not file a motion for new trial, and the record is silent as to defense counsel's reasons for not objecting to Detective Hardy's testimony or the photo spread. Generally, a silent record that provides no explanation for counsel's actions will not overcome the strong presumption of reasonable assistance. *See Rylander v. State*, 101 S.W.3d 107, 110 (Tex. Crim. App. 2003); *Edwards v. State*, 280 S.W.3d 441, 445 (Tex. App.—Fort Worth 2009, pet. ref'd).

Based on the record before us, in light of the strong presumption of reasonable professional assistance by defense counsel, and in the absence of any opportunity for defense counsel to explain his motive for not objecting to Detective

24

Hardy's testimony and the photo spread, we cannot say that Appellant has met his burden of showing by a preponderance of the evidence that his trial counsel's representation fell below the standard of prevailing professional norms. *See Strickland*, 466 U.S. at 690, 104 S. Ct. at 2066; *Rylander*, 101 S.W.3d at 110; *Thompson*, 9 S.W.3d at 813; *Edwards*, 280 S.W.3d at 445; *see also Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005) (stating that "trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective"). We overrule Appellant's second point.

## VI.  Conclusion

Having overruled each of Appellant's points, we affirm the trial court's judgment.


PER CURIAM

PANEL: GARDNER, DAUPHINOT, and WALKER, JJ.

PUBLISH

DELIVERED:  June 17, 2010

25